

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*970 Broad Street, Suite 700*                    *(973)645-2700*
*Newark, NJ 07102*

September 6, 2005

Hon. Katharine S. Hayden
United States District Judge
U.S. Post Office & Courthouse Building
P.O. Box 999
Newark, New Jersey   07101-0999

       Re:   United States v. Hemant Lakhani
          Criminal No. 03-880

Dear Judge Hayden:

       Enclosed please find two copies of a brief in
opposition to defendant's post-trial motions and sentencing
memorandum of the United States.

                 Respectfully submitted,

                 CHRISTOPHER J. CHRISTIE
                 United States Attorney

                 s/ STUART RABNER
                 By:  STUART RABNER
                 Assistant U.S. Attorney

cc:  Henry E. Klingeman, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA      :     Criminal No. 03-880

      v.                      :     Hon. Katharine S. Hayden

HEMANT LAKHANI

---

BRIEF IN OPPOSITION TO DEFENDANT'S POST-TRIAL MOTIONS
AND SENTENCING MEMORANDUM OF THE UNITED STATES

---

CHRISTOPHER J. CHRISTIE
United States Attorney
970 Broad Street
Newark, New Jersey  07102
(973) 645-2700

On the Brief:

STUART RABNER
BRIAN HOWE
Assistant U.S. Attorneys

Table of Contents

Page

Preliminary Statement........................................1

Statement of the Case.......................................2

    Procedural History......................................2

    Factual Background......................................2

Legal Argument............................................ 16

    POINT 1      DEFENDANT WAIVED ANY CHALLENGE BASED ON
                  OUTRAGEOUS GOVERNMENT CONDUCT BY FAILING
                  TO RAISE THIS CLAIM PRETRIAL.................16

    POINT 2      THE JURY HEARD AMPLE EVIDENCE OF LAKHANI'S
                  PREDISPOSITION BEFORE CONVICTING HIM.........27

                  A.   Defendant faces a heavy burden in
                      seeking relief from the jury's verdict...27

                  B.   Lakhani has not met his burden to
                      obtain a new trial......................30

    POINT 3      DEFENDANT IS NOT ENTITLED TO A NEW TRIAL
                  BASED ON A JUROR'S POST-VERDICT COMMENTS
                  ABOUT THE JURY'S INTERNAL DELIBERATIONS......34

    POINT 4      THE UNITED STATES SENTENCING GUIDELINES,
                  RENDERED ADVISORY BY BOOKER, MUST BE
                  CONSIDERED BY THE COURT AND WILL YIELD A
                  REASONABLE SENTENCE.........................38

    POINT 5      THE FACTORS OUTLINED IN 18 U.S.C. § 3553
                  WARRANT A SENTENCE WITHIN THE GUIDELINES
                  RANGE.......................................41

Conclusion.................................................44

<u>Preliminary Statement</u>

The United States respectfully submits this memorandum in connection with the sentencing of defendant Hemant Lakhani, scheduled for September 12, 2005.  This memorandum summarizes defendant's conduct, responds to defendant's post-trial motions, and contains legal argument relevant to sentencing.

1

<u>Statement of the Case</u>

<u>Procedural History</u>

On April 27, 2005, defendant Hemant Lakhani was found guilty by a jury on all counts in the superseding indictment against him:

*Attempting to provide material support to terrorists, 18 U.S.C. § 2339A (Count 1);

*Unlawful brokering, 22 U.S.C. § 2778 (Count 2);

*Money laundering, 18 U.S.C. § 1956 (Counts 3 - 4); and

*Attempting to import merchandise into the United States by means of false statements, 18 U.S.C. § 542 (Count 5).

The charges all related to Lakhani's efforts to broker the sale of up to 200 shoulder-fired, surface-to-air missiles to individuals whom Lakhani believed were terrorists.  The missiles were to be used in terrorist attacks to shoot down commercial aircraft in the United States.

Jury selection was conducted in December 2004, and the trial lasted from January 4, 2005 through April 27, 2005.  The government presented testimony from 14 witnesses;  the defense called four witnesses.  The trial was interrupted several times so that Lakhani could receive medical treatment.

<u>Factual Background</u>

The evidence presented at trial established that Lakhani initiated contact with a government informant in late 2001, on the advice of Abdul Qayyum.  At the time, Lakhani knew that Qayyum was wanted for a series of bomb blasts in India in

2

1993, known as the Mumbai blasts, which killed more than 200 people.  Lakhani also knew of Qayyum's violent extortionate conduct directed against one of Lakhani's former office mates.

Following Qayyum's advice, Lakhani called an individual whom neither man knew was an informant.  Lakhani offered to sell the informant weapons, which were available anywhere.  At all times, the informant posed as a representative of a Somali terrorist group, the Ogaden (National) Liberation Front ("OLF").  The group, according to the undercover operation, was interested in purchasing missiles and importing them into the United States for use in a "jihad" against America.

During the course of the undercover operation, Lakhani had more than 200 conversations and meetings with the informant, which were recorded.  Lakhani traveled to the United States for four of these meetings.  Three were held at a hotel overlooking Newark Liberty International Airport.

In the very first meeting on January 17, 2002, Lakhani demonstrated his willingness to sell missiles to terrorists.  At the outset of the meeting, which took place just months after the 9/11 attacks, Lakhani praised Al Qaeda's notorious leader, Osama Bin Laden.  Lakhani commented that Bin Laden "has straightened these idiots," referring to Americans.  "He did a very good thing."

Soon after, Lakhani gave the informant a weapons brochure from Ukrspetsexport, Ukraine's State Company for the Export and Import of Military and Special Products and Services.

3

Lakhani also brought with him copies of three business cards of officials at Ukrspetsexport.  At various times, Lakhani boasted about his connections to arms dealers at this company as well as Omnipol, a Czech arms supplier.

Also during the first meeting, the informant explained that he wanted to obtain the latest shoulder-fired missile, like the U.S.-made Stinger missile.  Lakhani responded that "they are available."  The informant further explained that he represented the OLF, which had given him money to buy missiles they needed.  The informant discussed buying 20 to 50 missiles to start with.  Lakhani replied that "the quantity seems to be very small. . . . If I have to take this risk, better if a good quantity comes out."

Days after this meeting, Lakhani traveled to the Ukraine.  This marked the first of a dozen trips Lakhani ultimately made to the Ukraine and Russia in an effort to obtain shoulder-fired, surface-to-air missiles for the OLF.  In a recorded conversation while in the Ukraine, Lakhani promised that "whatever you ask for is available. . . .  You can get as many pieces as you want."  A few weeks later, Lakhani caused a fax to be sent to the informant about an air defense complex which included 48 surface-to-air guided missiles.

Lakhani traveled to the United States for a second meeting with the informant on April 25, 2002.  Lakhani was captured on videotape declaring that "your brother" -- referring to the head of the OLF -- "wants IGLA.  You will get it.  I will

4

obtain it.  It's called IGLA."  Lakhani was describing the Soviet counterpart to the Stinger missile:  the IGLA Man-Portable Air-Defense Missile System (or Manpad).  Later in the meeting, Lakhani boasted that the IGLA was superior to the Stinger.

As at the first meeting, the informant made clear that this was an illegal deal, in furtherance of "jihad" (holy war).  Lakhani, in turn, asked "[w]here do you want the delivery? . . . How many do you want?"  At another point, Lakhani commented that no one would provide an end-user certificate for such a transaction, so there would be "an extra cost."

End-user certificates are required to document lawful arms transactions.  They specify the nature of the goods being shipped and the ultimate destination, verifying that the arms are approved for shipment and headed to an approved destination.  It would be impossible to obtain an end-user certificate or similar document for the shipment of IGLA missiles contemplated; instead, Lakhani planned to use false documents to conceal the nature of the product.

In both of the first two meetings, Lakhani made multiple references to his sources of supply for arms in the Ukraine and Moscow, as well as customers for whom he had worked in India and various African countries.

Representatives of New Scotland Yard conducted a search of Lakhani's London residence in August 2003.  They found correspondence relating to numerous arms sales that Lakhani attempted before he first contacted the informant.  Government

5

Exhibit 625 summarizes more than a dozen weapons deals involving Lakhani, including attempts to purchase aerial bombs, a radar complex, ammunition, armored personnel carriers, MI-24 attack helicopters, MiG 23, 27, and 29 aircraft, fuel air explosion bombs, artillery-fired ammunition, shoulder-fired rocket launchers, mortar launchers, machineguns, grenades, mines, detonators, fuses, mortar bombs, T-72 tanks, airplanes, and military helicopters.  Lakhani worked on these deals with India and various African nations from August 1999 to September 2001 -- before he contacted the informant.  (Lakhani also brokered the sale of 11 armored personnel carriers from Ukrspetsexport to Angola.  This deal was begun in 2000 and completed in 2003.)  Also found during the search were dozens of business cards of officials at Ukrspetsexport and Omnipol, some with handwritten home telephone numbers, as well as various weapons brochures pre-dating the undercover investigation.

Days after the second meeting on April 25, 2002, Lakhani called the informant and reported that the "merchandise is available" at the price of $75,000 for one "piece."  The buyer could have "as many pieces as he wants," Lakhani explained.  The following day, Lakhani traveled again to the Ukraine.  Soon after, on May 16, 2002, Lakhani sent a four-page fax about the IGLA to the informant.  The fax detailed the weapon's major specifications:  its speed, warhead weight, combat payload and capabilities.  A brochure containing identical information -- of which the fax appears to be a copy -- was found in Vijay Raja's

London residence.  Raja testified at trial that he faxed materials related to the missile deal to the United States, at Lakhani's request.

In August 2002, a month before the one-year anniversary of the 9/11 attacks, Lakhani and the informant discussed the timing of the shipment of a sample missile.  Lakhani understood that the buyers "wanted it for the anniversary."  "I know we have to give them the wedding cake," Lakhani stated in another taped conversation.

On August 20, 2002, Lakhani caused a fax to be sent to the U.S. on the letterhead of another arms supplier:  Laberia Co., Ltd., with offices in Kiev, Moscow, and Larnaka, Cyprus. The letter was signed by Laberia's director and quoted a price of $87,000 for an IGLA-S portable anti-aircraft missile complex.

Lakhani traveled to the US for a third meeting with the informant on September 17, 2002.  "It is good that [their anniversary] is over," Lakhani explained, "because these sister-fuckers were too vigilant on all sides.  They were very alert." Elsewhere during the meeting, the two discussed issues relating to price, quantity, delivery schedule, and technical support. They also reviewed the purpose of their mission -- to start a holy war on American soil and to destroy the national economy. Overlooking Newark Airport, Lakhani stated, "[y]ou have to destroy their economy."  The informant added that the Somalian buyers he represented wanted "to start a Jihad in America," and not carry out a truck bombing of an overseas American Embassy.

"Right," Lakhani replied.  "If you cause one explosion here, it will give them shivers" and "destabilize their economy."  At another point Lakhani noted that "[a] small disturbance will sink them and sink their economy if one [plane] is shot down.  Suppose 50-100 people are killed in the plane and a few on the ground, they will wonder how it came by air.  This will shake them."

Lakhani spoke at some length during this meeting about his earlier background as a barrister and merchant who, for the past 4 or 5 years, worked his way into the arms trade.  He explained that he had been working to cultivate friendships with arms dealers in the Ukraine and Russia, and that his only business at present was "mara-mari" (referring to the weapons business).  He stated that he used the tailoring business as a cover.  Lakhani confirmed that a government company -- Ukrspetsexport -- had steered him to an offshore company in Cyprus -- Laberia -- which handled "shady business."

Toward the end of the meeting, the conversation returned to the plan's underlying purpose.  Looking out at the airport again, Lakhani called it "the perfect place."  "These sister-fuckers will be shaken badly around the airport.  This airport will remain closed for two years. . . .  It will be very hurtful economically.  Isn't it?  They will suffer a lot economically."  The informant then asked, "[w]hat else can be used to destroy America?"  "This is the only thing," Lakhani replied.  "You can't destroy them with weapons.  It has to be economically."

8

In a series of conversations, Lakhani insisted on full payment for the sample missile up front.  The first installment of $30,000 was paid in October 2002;  the second payment of $56,500 was made in March 2003.  These transfers involved three associates of Lakhani, whom he brought into the scheme:  (a) Hameed Zubair, who owned a money exchange business in Europe; (b) Vijay Raja, who received and sent faxes for Lakhani and maintained a Swiss bank account; and (c) Yehuda Abraham, a jeweler in Manhattan's diamond district who also operated a money transfer business.  (Raja pleaded guilty to money laundering; Abraham pleaded guilty to operating an unlicensed money transmitting business.)

Lakhani directed how both payments should be made.  At his and Zubair's request, the informant delivered $30,000 in cash to Abraham in Manhattan on October 16, 2002.  Abraham wire transferred the money (less commission) to an account in Hong Kong maintained by Zubair.  Raja then picked up the cash from Zubair's money exchange house in London, on behalf of Lakhani.

The second transfer traveled circuitously as well. Lakhani cautioned against the informant paying the missile supplier directly:  "No, you will get caught.  Try to save your skin."  Instead, per Lakhani's faxed instructions, $56,500 was wire transferred on March 4, 2003 to a Swiss bank account maintained by Raja in the name of Kirbyville Company, SA.

Several developments occurred between the two payments. In November 2002, Lakhani caused a contract from Laberia to be

9

faxed to the informant.  In the document, the buyer's name was blank, and the product for sale was described as "spare parts" at a cost of $85,000.  At various points, Lakhani stressed how important it was to conceal one's name:  "If your name appears anywhere, you are gone for the rest of your life."

Later that month, terrorists attempted to shoot down a civilian aircraft carrying 261 vacationing tourists from Kenya to Israel.  The terrorists used two Russian-made SA-7 shoulder-fired missiles, an older model manufactured in the 1960s.  In conversations after this attack, Lakhani instructed the informant to obtain the *Time* and *Newsweek* editions covering this story, which compared the SA-7 to the newer SA-18 model Lakhani was trying to broker.  "That is an ordinary box," Lakhani explained, "but ours is a high-class box."  Lakhani directed the informant to tell his Somali buyers that "the box we provide will destroy everybody."  A witness from the Defense Intelligence Agency testified at trial about the superior accuracy and capabilities of the SA-18.

In February 2003, Lakhani caused an invoice to be sent from a third arms-related company, Prania Limited, located in Larnaka, Cyprus.  The invoice identified a product originating in Russia as "spare parts" for medical facilities and a laboratory bench, for a total cost of $60,000.  Banking coordinates for Raja's Swiss bank account were listed as well, identifying how payment should be made.

By the end of February 2003, Lakhani's passport and

10

telephone conversations revealed that he had traveled to the Ukraine ten times in furtherance of the missile deal.  His trips and dealings with real arms suppliers attracted the attention of Russian law enforcement officials.  A colonel of the Russian Federal Security Services testified at trial that the Russians opened their own investigation after learning of an arms contract between Laberia and Lakhani for the supposed sale of "agricultural" products.

The investigation raised further concerns on the part of the Russians, and they decided to infiltrate Lakhani's negotiations in order to prevent him from obtaining an actual missile.  The Russians began their investigation independently, that is, without any knowledge of the FBI's ongoing case.  The two agencies ultimately coordinated their efforts.

Lakhani traveled to Russia in April 2003 and met with two Russian undercover agents.  They posed as weapons suppliers who could sell Lakhani IGLA missiles.  Lakhani traveled to meet with them again in July 2003, along with the FBI's informant.  At a warehouse in Moscow, the four examined a sample IGLA SA-18 missile, from which the explosive charge had been removed. Lakhani next saw the missile off at a dock in St. Petersburg, from where it was supposed to travel to the United States.

Accompanying the missile was a bill of lading describing the item as "dental equipment."  Lakhani sent the informant an original copy of this false shipping document. Previously, Lakhani had told the informant that he needed to

bribe customs officials to arrange for the missile to be shipped.

Lakhani next saw the missile on August 12, 2003 at a hotel suite overlooking Newark Airport.  This marked his fourth trip to meet the informant in the United States.  Days before the meeting, the informant confirmed to Lakhani that his men had received the merchandise and delivered it to a warehouse.  A videotape captured Lakhani's reaction when he observed the sample missile in the hotel room; he was seen smiling broadly, clapping his hands, and gesturing with excitement.  "You are a wonderful man," he exclaimed.

Lakhani went on to offer advice on how to use the sample missile and 50 more he intended to broker.  Speaking to someone he believed represented a group of terrorists, while looking directly at the airport, Lakhani pronounced, "if we strike fifty at one time, simultaneously, it will fuck their mother. . . .  It will shake them.  Then they will run. . . .  Strike simultaneously at . . . whatever time you decide.  All at once in different cities at the same time. . . .  They will think the war has started."

During the meeting, Lakhani and the informant removed the missile from its container and examined it.  Lakhani offered to arrange for a demonstration and training for 50 people.  He also assured the informant that the next shipment of missiles would arrive before the second anniversary of the 9/11 attacks -- then one month away.  Looking at aircraft parked outside their hotel, Lakhani observed that the Americans "will be badly shaken"

12

by an attack.  "If it happens 10 or 15 places simultaneously . . . [t]he people will be scared to death that how could this have happened."  In a reference to the informant's role representing terrorists, Lakhani continued, "[t]hey will realize that you people are 'wide awake, alive and vibrant.'  They will know that you people are not yet dead."

The meeting was interrupted by several telephone calls related to the delivery of $500,000 in cash to buy more missiles, to be followed by additional cash payments.  Zubair called and advised that a relative -- Moinuddeen Ahmed Hameed -- was present to handle the delivery.  (Hameed pleaded guilty to conspiracy to operate an unlicensed money transfer business.)  Raja also called and discussed a delivery of money to Abraham.

Toward the end of the meeting, Lakhani spoke about the number of victims of the planned attack.  "[T]here are 300 to 400 people on one commercial flight," Lakhani noted, pointing out that Mondays and Fridays are the busiest travel days.  Lakhani again stressed that multiple attacks should be done simultaneously.  Using Lakhani's calculations, 3,000 to 6,000 people would have been killed.

Sprinkled throughout the conversations are a series of anti-American references by Lakhani.  Among them are Lakhani's criticisms of American arms inspectors monitoring overseas arms deals.

Lakhani and the informant also discussed obtaining a "dirty bomb" at various times.  This type of weapon spreads

13

radioactive material along with a regular explosive.  Lakhani

traveled to the Ukraine after the informant's initial inquiry.

He then reported back that the item was available at a price of

$3 million.  "If you drop it," Lakhani explained, "it will blow

up whole Sharjah."  (Sharjah is a large area in the United Arab

Emirates.)  The two discussed this weapon at other times as well,

with Lakhani offering to procure it.

Lakhani also raised the subject of Iqbal Mirchi, whom

he identified as someone "behind the blasts in Mumbai" -- the

serial bomb blasts in India in 1993, for which Abdul Qayyum was

also wanted.  During the September 2002 meeting with the

informant, when the missile deal and attacks on American soil

were discussed, Lakhani also reported that a similar plan was

underway in Dubai.  He stated that Mirchi had approached him and

asked Lakhani to make preparations.  According to Lakhani, Mirchi

was preparing a "shopping list" for him to obtain.  Lakhani

estimated that an end-user certificate in that transaction would

cost 10 percent.

Defendant presented an entrapment defense at trial,

claiming that he was induced by the government, through its

informant, and that he was not predisposed.  The jury's verdict

necessarily rejected this defense.  Defendant now belatedly

raises a due process challenge to the indictment, relying on

United States v. Twigg, 588 F.2d 373 (3d Cir. 1978).  In a

related motion, he claims there was insufficient evidence of

predisposition.  In addition, defendant relays post-verdict

14

statements of a juror, which afford him no relief under established case law and a specific evidentiary rule.

This brief contains the government's opposition to defendant's post-trial challenges.  In addition, the memo sets forth the government's position on sentencing.  For the reasons stated below, defendant's egregious conduct warrants the sentence of life imprisonment that the Guidelines and the Presentence Report call for.  This would result in a sentence at the statutory maximum on each count of conviction.

LEGAL ARGUMENT

POINT 1

DEFENDANT WAIVED ANY CHALLENGE BASED ON
OUTRAGEOUS GOVERNMENT CONDUCT BY FAILING
TO RAISE THIS CLAIM PRETRIAL.

Lakhani has consistently maintained that he was entrapped by the government.  In pretrial motions and throughout the trial, Lakhani argued that the case against him was conceived, planned, and executed by government agents.  Now, for the first time, he raises a claim of outrageous government conduct.  Because he failed to do so pretrial, he has waived this meritless challenge.

The "defense of outrageous government conduct is based on an alleged defect in the institution of the prosecution and, as a consequence, is covered by the provisions of Fed.R.Crim.P. 12(b). . . ."  United States v. Pitt, 193 F.3d 751, 760 (3d Cir. 1999).  Rule 12(b)(3) requires that motions alleging a defect in instituting the prosecution or a defect in the indictment or information must be raised before trial.[1], [2]

---

[1]  The text of Rule 12(b) is as follows:

(3) **Motions That Must Be Made Before Trial**.  The following must be raised before trial:

(A) a motion alleging a defect in instituting the prosecution;

(B) a motion alleging a defect in the indictment or information.

[2]  The defense is then properly considered by the court, not the jury.  Pitt, 193 F.3d at 760;  United States v. Nolan-Cooper, 155 F.3d 221, 234 (3d Cir. 1998).

16

A defendant who fails to raise the claim pretrial waives the right to assert this defense.  Id.; United States v. Nunez-Rios, 622 F.2d 1093, 1098-99 (2d Cir. 1980).  The case law acknowledges a sensible exception to this rule:  motions must be brought pretrial "unless the evidence supporting the claim of outrageous government conduct is not known to the defendant prior to trial."  Pitt, 193 F.3d at 760.  For this reason, the Third Circuit was reluctant to bar a defendant's belated claim in United States v. Gonzalez, 927 F.2d 139, 143 (3d Cir. 1991), since the facts forming the basis for the challenge were not disclosed until the eve of trial.

Defendants must provide a "good explanation" for failing to raise the defense in a pretrial motion.  Pitt, 193 F.3d at 760.  Lakhani cannot.  From early on in this case, Lakhani has made the same arguments underlying his pending motion -- in pretrial motions, to the media, and at trial. Specifically, defendant's brief in support of his pretrial motions raises the very points he now relies on to claim outrageous government misconduct.  Among other statements, the brief alleges that the government invented the plot, provided the idea, supplied the buyer and seller, offered financial encouragement, constructed a fake missile, and brought it to the United States for use in the investigation.  Defendant's Pretrial Brief, dated 3/12/04, at 1-2.  These very details reappear in his pending post-trial motion.  Tellingly, defendant's pre-trial brief declares that

17

> Mr. Lakhani will also assert a claim of due
> process violation by virtue of the Government's
> outrageous conduct in initiating the sale and
> providing both a buyer and a seller and a fake
> missile to effectuate the sale, regardless of
> whether Mr. Lakhani is able to show lack of
> predisposition.  See United States v. Twigg, 588
> F.2d 373 (3rd Cir. 1978).

Id. at 13.

Lakhani was plainly aware of the facts and the relevant law.  He should have acted on them pretrial.  Under well-settled Circuit law, he cannot do so now.

Even if Lakhani had raised this challenge prior to trial, it would not have succeeded because his claim falls far short of the narrow due process defense recognized in this Circuit.

Although the Third Circuit has not entirely abandoned the doctrine that outrageous government conduct can support dismissal of an indictment, "the viability of the doctrine is hanging by a thread."  Nolan-Cooper, 155 F.3d at 230.  "[C]ourts have rejected its application with almost monotonous regularity." Id., quoting United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993) ("The banner of outrageous conduct is often raised but seldom saluted.").

Relief is available for the government's investigative tactics only if "the challenged conduct [is] shocking, outrageous, and clearly intolerable. . . .  The cases make it clear that this is an extraordinary defense reserved for only the most egregious circumstances."  Nolan-Cooper, 155 F.3d at 230-31,

18

quoting United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992).  Dismissal of an indictment and the effective immunizing of a defendant is appropriately reserved "only to 'curb the most intolerable government conduct.'" United States v. Beverly, 723 F.2d 11, 12 (3d Cir. 1983), quoting United States v. Jannotti, 673 F.2d 578, 608 (3d Cir. 1982) (en banc).  See generally Pitt, 193 F.3d 761-62 & n.11 (rejecting the claim and citing Third Circuit decisions calling the viability of the claim into doubt).

The outrageous government conduct defense was first suggested in United States v. Russell, 411 U.S. 423 (1973).  In that case, the Supreme Court accepted that in certain extreme cases the conduct of law enforcement agents may be so egregious that due process would bar conviction.  Id. at 431-32.  In Hampton v. United States, 425 U.S. 484 (1976), the Supreme Court, in a three-way split opinion, appeared to limit this defense to only the most extreme investigative acts of government agents. The plurality opinion, joined by three Justices, rested on the position that governmental misconduct can never be used to overturn a conviction once predisposition has been shown.  Id. at 488-90.  Although this position was not joined by a majority of the Court, the concurring opinion of Justice Powell indicates that "the cases, if any, in which proof of predisposition is not dispositive will be rare."  Id. at 495 n.7.  Justice Powell's later opinion in United States v. Payner, 447 U.S. 727 (1980), casts a long shadow--at the very least--on the existence of this narrow doctrine.  See Nolan-Cooper, 155 F.3d at 229-30

19

(discussing cases that analyze the import of <u>Payner</u>).

The due process defense in the Third Circuit has its roots in <u>United States v. Twigg</u>, 588 F.2d 373 (3d Cir. 1978).  In <u>Twigg</u>, a government informant set up a methamphetamine laboratory in a government-rented building with government-obtained materials.  The government informant manufactured the drug with virtually no assistance from the defendant.  <u>Id</u>. at 376.  The defendant was arrested after he picked up the manufactured drug from the government informant.  The Third Circuit reversed the conviction in this "egregious" case on due process grounds.  <u>Id</u>.; <u>Nolan-Cooper</u>, 155 F.3d at 230.

<u>Twigg</u> has stood alone as the only appellate case since <u>Hampton</u> in which a conviction was reversed on due process grounds.  <u>See</u> <u>Nolan-Cooper</u>, 155 F.3d at 230.  Moreover, Third Circuit cases since <u>Twigg</u> have construed it very narrowly.

The decision in <u>Nolan-Cooper</u> contains a thorough review of the defense of outrageous government misconduct, noting its tenuous viability.  The decision also explains,

> While continuing to recognize, in theory, the outrageousness defense, we have nonetheless observed that, because of the extraordinary nature of the doctrine, the judiciary has been "extremely hesitant" to uphold claims that law enforcement conduct violates the Due Process clause.  <u>See</u> <u>Voight</u>, 89 F.3d at 1065; <u>United States v. Jannotti</u>, 673 F.2d 478, 608 (3d Cir. 1982)(in banc).

<u>Id</u>.

Accordingly, defendants relying on <u>Twigg</u> must hurdle an extremely high threshold to prevail.  As cited above, they must

20

show that the challenged conduct is "shocking, outrageous, and clearly intolerable." Nolan-Cooper, 155 F.3d at 230 (quoting United States v. Mosley, 965 F.2d at 910). See also Jannotti, 673 F.2d at 607 ("a successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense."). In applying this standard, the Third Circuit has urged great caution: "We must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable." Id.

The Circuit has been particularly reluctant to apply Twigg to undercover investigations. "Despite the holding in Twigg, this court and other appellate courts have since exercised extreme caution in finding due process violations in undercover settings." United States v. Gambino, 788 F.2d 938, 945 n.6 (3d Cir. 1986). See also United States v. Engler, 806 F.2d 425, 429-30 (3d Cir. 1986).

Beverly provides a good example of the "extreme caution" exercised by the Third Circuit in considering the Twigg defense. In Beverly, the defendants were introduced to a government agent who posed as a person seeking an arsonist to burn down a building. The agent drove the defendants in a government car to a gasoline station, bought gasoline, made sure that the defendants had matches, drove the defendants to a government-owned building that was the target, and looked on while the defendants were arrested. 723 F.2d at 12. The Third Circuit rejected the due process defense on these facts,

21

commenting:

> The Supreme Court has admonished us that the federal judiciary should not exercise "'a Chancellor's foot' veto over law enforcement practices of which it [does] not approve." <u>United States v. Russell</u>, 411 U.S. 423, 435 . . . (1973). We are not prepared to conclude that the police conduct in this case shocked the conscience of the Court or reached that "demonstrable level of outrageousness" necessary to compel acquittal so as to protect the Constitution. <u>Hampton</u>, 425 U.S. at 495 n.7 . . . (Powell J., concurring).

<u>Id</u>. at 12-13.

The facts in this case do not present the extremely rare case of outrageous government conduct that could justify dismissal of counts in an indictment. Lakhani's selective assertions -- which would not support dismissal in any event -- leave out critical facts that undermine his claim. A few examples follow:

*The government did not initiate contact with Lakhani. Lakhani contacted the government informant on the advice of a terrorist, Abdul Qayyum, who was wanted for a series of bomb blasts in India in 1993 which killed more than 200 people. Lakhani knew of Qayyum's notoriety, and also had firsthand knowledge of Qayyum's violent extortionate behavior directed against Lakhani's own former office mate.

*In the first call Lakhani placed to the informant, Lakhani stated that he was in the weapons business, that his source of supply was the Ukraine, and that he had details and information about all types of weapons. Tr. 2:151-52. Lakhani confirmed this information in subsequent calls. When asked in

22

the first taped conversation if "the Ukraine stuff" was available "anywhere we want," Lakhani replied, "[y]es, you will get it." Ex. 101T, at 2. For his part, the informant explained that he represented a terrorist group that needed weapons. Tr. 3:24 (indicating volume 3, page 24, of the trial transcript).

*With knowledge that the informant was seeking weapons for terrorists, Lakhani traveled to the United States four times. At the first meeting, Lakhani gave the informant a weapons brochure from a Ukrainian arms supplier, along with copies of business cards of company officials. He also praised Osama Bin Laden only a few months after his attack on the United States. And Lakhani promised to procure shoulder-fired missiles to someone seeking them for a "jihad" against America. Yet under Lakhani's version of events, he was an "unworthy target" for investigation.

*Lakhani enthusiastically pursued the deal in a variety of ways. He traveled extensively to the Ukraine and Russia, making the first of a dozen trips days after meeting the informant. He negotiated with no fewer than three arms suppliers, which he located on his own, to obtain surface-to-air missiles for terrorists. He faxed numerous documents to the informant marking his progress and providing details of the negotiations. The faxes offered price quotes, outlined shipping details, and included draft contracts, among other things -- all with real arms traders. Lakhani, as well as the informant, pushed the deal forward.

23

*Lakhani did indeed have contacts and experience in the world of arms trading -- *before* he contacted the informant. Although Lakhani tried to persuade the jury that he knew nothing about arms, Tr. 8:12, 8:128, 9:10-11, he had in fact worked on more than a dozen weapons deals prior to the fall of 2001.  See Ex. 625.  On tape, he confirmed that the "mari-mari" (weapons) business was his only business, and that he had spent 4 or 5 years cultivating relationships with arms dealers in the Ukraine and Russia.  Ex. 129T, at 42, 46, 69, 72.  His passports offered further proof on this point.  Furthermore, Lakhani brokered the sale of 11 armored personnel carriers from Ukrespetsexport to Angola.  He also admitted having been approached by Iqbal Mirchi for weapons.  Lakhani himself explained that Mirchi was behind the Mumbai blasts in 1993.  Mirchi was preparing a shopping list and looking for an end-user certificate, because the people in Dubai were "getting ready to do the same thing."  Ex. 129T, 24-27.  To whom did Mirchi turn?  "You make preparations," Mirchi told Lakhani.  Id. at 25.

*Although Lakhani claims the informant was "completely in charge," it was Lakhani who repeatedly volunteered advice on how to carry out an attack on American soil and maximize its consequences.  "[I]f we strike fifty [missiles] at one time, simultaneously, it will fuck their mother. . . .  It will shake them.  Then they will run. . . ," Lakhani explained to an individual he believed represented a group of terrorists.  Ex. 254T, at 4-5.  "Strike simultaneously at . . . whatever time you

24

decide.  All at once in different cities at the same time. . . . They will think the war has started."  Id. at 5.  "If it happens 10 or 15 places simultaneously . . . [t]he people will be scared to death that how could this have happened."  Id. at 22.

The facts -- known pretrial -- do not support a finding that the government's conduct in this investigation "shocks the conscience" or was in any way intolerable or outrageous.  The government used a paid informant to further an undercover investigation.  But it is simply wrong to suggest that either the informant or the government was completely in charge, or that Lakhani was a passive actor in this scheme.  The facts show otherwise.  Lakhani wishes to keep the focus on the government and off his own conduct for good reason:  his deliberate, sustained, voluntary behavior distinguishes this case from Twigg. Indeed, it is Lakhani's words and deeds -- designed to help shoot civilian aircraft out of the sky -- that shock the conscience, not the government's steps to investigate him.

Lakhani also glosses over the nature of the charges against him as he asks for the indictment to be dismissed.  The jury found him guilty of *attempting* to provide material support to terrorists (Count 1) and unlawfully engaging in *brokering* activities (Count 2).  To be convicted under Count 1, a person need not succeed, as the Court properly instructed the jury.  Tr. 19:196.  In other words, one need not actually supply a missile. Likewise, to be convicted of "brokering" foreign defense articles, it is enough to negotiate, or finance, or facilitate a

transfer, as the Court instructed. Tr. 19:205. Once again, a person need not supply a missile. Lakhani nonetheless continues to stress that Russian undercover agents provided him one. Lakhani ignores that there was ample evidence to convict him of an attempt crime, and of brokering, before Russian law enforcement authorities entered the case.

As at trial, Lakhani fails to mention the other charges for which he stands convicted: two counts of money laundering (Counts 3-4) and one count of attempting to import merchandise by means of false statements (Count 5). Lakhani provided the idea for how the money transfers would be made; provided the needed contacts -- a network of money laundering conspirators unknown to the government; directed where the $30,000 cash down payment should be brought; and urged that the balance be paid by wire transfer to an account whose particulars he supplied, instead of permitting the informant to pay the arms traders directly. With regard to the attempted importation and false statements violation, Lakhani repeatedly directed that false documents be used to conceal the real item he tried to import. See Ex. 116T, at 1; 117T, at 2; 125T, at 1; 129T, at 19, 30. He then faxed documents containing false descriptions. See, e.g., Ex. 33B, 39. The government followed his lead. Twigg does not even arguably apply to these counts.

For all of these reasons, Lakhani's due process challenge would not have prevailed had it been filed before trial. His belated motion should be denied.

26

POINT 2

THE JURY HEARD AMPLE EVIDENCE OF LAKHANI'S
PREDISPOSITION BEFORE CONVICTING HIM.

Lakhani moves for a judgment of acquittal under Rule 29 claiming the government failed to produce sufficient evidence of his predisposition to commit the crimes for which he stands convicted.  In support of this claim, Lakhani adopts the arguments presented during defense summation and declares that there is no evidence of predisposition.  Lakhani's brief submission falls far short of carrying his heavy burden on this claim.

A.    Defendant faces a heavy burden in seeking relief from the
      jury's verdict.

Under Rule 29, defendants may seek a judgment of acquittal "if the evidence is insufficient to sustain a conviction. . . ."  Fed. R. Crim. P. 29(a).  The legal standards governing this rule are well-settled.  Rule 29 requires that the Court "view the evidence in the light most favorable to the jury verdict, and presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." United States v. Iafelice, 978 F.2d 92, 94 (3d Cir. 1992); see United States v. Voight, 89 F.3d 1050, 1080 (3d Cir. 1996).  A challenge to the sufficiency of the evidence must be reviewed in accordance with "strict principles of deference to a jury's verdict."  United States v. Rosario, 118 F.3d 160, 162-63 (3d Cir. 1997).  The Court may overturn a guilty verdict only if "no

27

reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987) (citations omitted); see Burks v. United States, 437 U.S. 1, 16-17 (1977).

Reversal on the ground of insufficient evidence is "confined to cases where the prosecution's failure is clear." United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984), quoting Burks v. United States, 437 U.S. at 17.  "The evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt."  United States v. Allard, 240 F.2d 840, 841 (3d Cir. 1957); see United States v. Veksler, 62 F.3d 544, 551 (3d Cir. 1995).  The Court reviews the evidence to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979)(emphasis in original).

A court considering a motion for judgment of acquittal "cannot and should not weigh the evidence."  United States v. Giampa, 758 F.2d 928, 934 (3d Cir. 1985).  The Court must not usurp the jury's function and substitute its own view as to the weight of the evidence, the reasonable inferences to be drawn, or the credibility of witnesses.  Id. at 935.  All credibility issues must be resolved in the government's favor.  See United States v. Scanzello, 832 F.2d 18, 21 (3d Cir. 1987).

28

The Court should "review[] the totality of the circumstances," <u>United States v. Leon</u>, 739 F.2d at 891, and not analyze individual facts and inferences in isolation.  <u>See</u> <u>United States v. Picciotti</u>, 40 F. Supp. 2d 242, 245 (D.N.J. 1999), <u>aff'd</u>, 229 F.3d 1140 (3d Cir. 2000).  When the evidence relating to a specific element "would enable a reasonable fact finder to infer . . . [the existence of the element] beyond a reasonable doubt, the due process requirement for sufficiency of the evidence on that element . . . is satisfied."  <u>Government of Virgin Islands v. Greene</u>, 708 F.2d 113, 115-16 (3d Cir. 1983).

A defendant challenging the sufficiency of the evidence bears a "very heavy burden."  <u>United States v. Gonzalez</u>, 918 F.2d 1129, 1130 (3d Cir. 1990); <u>see</u> <u>United States v. Dent</u>, 149 F.3d 180, 187 (3d Cir. 1998); <u>United States v. Casper</u>, 956 F.2d 416, 421 (3d Cir. 1992).  He cannot "simply reargue [his] defense" -- as Lakhani is attempting to do.  <u>United States v. Smith</u>, 186 F.3d 290, 294 (3d Cir. 1999). [3]

---

[3]  Similarly, a defendant seeking a new trial pursuant to Rule 33 must shoulder a heavy burden:

> The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand. . . .  Motions for new trials based on weight of the evidence are not favored. Courts are to grant them sparingly and with caution, doing so only in those really "exceptional cases."

<u>United States v. Martinez</u>, 763 F.2d 1297, 1313 (11th Cir. 1985); <u>accord</u> <u>United States v. Clemons</u>, 658 F. Supp. 1116, 1119 (W.D. Pa. 1987) (new trial remedy exercised "sparingly," and only where the evidence "preponderates heavily against the verdict"), <u>aff'd</u>,

Measured against these standards, Lakhani's arguments cannot prevail.

B.   Lakhani has not met his burden to obtain a new trial.

This Court properly instructed the jury that, in order to defeat Lakhani's entrapment claim, the government had to prove beyond a reasonable doubt *either* that Lakhani was predisposed *or* that the government did not induce him.  Accordingly, no proof of predisposition is required to disprove the defense of entrapment.[4]  Nonetheless, the jury heard ample evidence of Lakhani's predisposition.  A few highlights are discussed below.

This Court also instructed the jury that

> [t]he government may show that Mr. Lakhani was predisposed, or inclined, to commit the offenses charged if the Government proves that Mr. Lakhani was ready and willing to break the law.  The Government may prove this propensity . . . by showing Mr. Lakhani's willingness to commit the offenses for which he is charged as shown by his ready response to the inducement.

Tr. 19:226.  There was an overabundance of evidence presented on Lakhani's enthusiastic, ready and willing responses throughout the investigation, including a dozen trips he made to the Ukraine and Russia, four trips to the United States, multiple faxes he obtained and sent to the informant, the money laundering network

---

843 F.2d 741 (3d Cir. 1988).

[4]  Much of the government's rebuttal summation was devoted to reviewing evidence of Lakhani's predisposition.  The government likewise incorporates its arguments to the jury on this issue.  <u>See</u> 19:108-162.  The government also argued that Lakhani was not induced.  <u>Id</u>.

he brought into the case, and other actions he took.

In addition, Lakhani's words repeatedly demonstrated his ready and enthusiastic willingness to break the law. From the earliest days of the scheme, Lakhani eagerly offered that shoulder-fired missiles were available, and he encouraged the informant to order a large quantity of weapons. Ex. 102T, at 24, 44; Ex. 103T, at 2, 4. After two trips to the Ukraine in the early stage of the case, Lakhani succinctly announced, "[y]ou will get it. I will obtain it. It is called Igla. . . . Igla is much better, much better (than Stinger). How many do you want?" Ex. 109T, at 20-21. When told by the informant that he wanted 200 missiles, Lakhani readily responded, "[i]t will be done. There is plenty of stuff available. Id. at 21. Lakhani's ready responses continued in the months that followed; see, e.g., Ex. 110T, at 2; 123T, at 1; 195T, at 5; 176T, at 63; and he remained a willing, eager arms broker until the very end. Just days before his arrest, at a point when he believed the first stage of the deal was complete, Lakhani pressed the informant by asking, "[w]hat is the next order for me?" Ex. 248T, at 2.

Time after time, Lakhani showed his ready willingness to break the law. On this basis *alone*, the jury had adequate proof of predisposition. This Court need go no further in evaluating Lakhani's motion -- but there is more.

Another factor this Court instructed the jury to consider on the issue of entrapment was Lakhani's "background or character or reputation." Tr. 19:226. Among other relevant

31

proof of Lakhani's background and character are the following:

*According to the evidence at trial, Lakhani had previously worked in the clothing business and later used it as a "front".  Ex. 129T, at 62.  He was fronting for his efforts in the murky world of arms dealing.  <u>See</u> Point 1, infra.

*While attempting to complete various arms deals, Lakhani maintained an association with a wanted terrorist, Abdul Qayyum, on whose advice Lakhani contacted the informant.  <u>See</u> Point 1, infra.

*Lakhani was also approached by Iqbal Mirchi, whom he knew was a suspect in the 1993 Mumbai blasts.  Mirchi wanted weapons for the people in Dubai, who were "getting ready to do the same thing."  <u>See</u> Point 1, infra.

*Lakhani associated with Saeed Al Swedi, who was working on obtaining a (fraudulent) end-user certificate for Lakhani.  Ex. 228T, at 4.  Lakhani admitted that Al Swedi was involved in "underground" business and that for Al Swedi, "51 pieces [missiles] is a joke."  Ex. 236T, at 44-50.

*Lakhani had contacts who could obtain blank passports for the informant.  Lakhani made this offer in the context of obtaining passports for "mujahids" or holy warriors.  Ex. 129T, at 65-66, 79.

*Lakhani not only introduced associates who could launder money, but he raised the idea of bribing officials in order to get weapons through customs.  Ex. 132, at 4.

*Rounding out Lakhani's character are his ugly anti-

American views, which offer a motive for his advice on how to use the missiles to maximum effect:  by attacking civilian aircraft simultaneously in 10 or 15 cities.  Ex. 254T, at 5, 22, 26.

Lakhani's ready willingness to break the law and his character, among other things, provided the jury persuasive proof of his predisposition.  Viewing all the evidence in the light most favorable to the jury's verdict, there was sufficient evidence for a rational jury to find Lakhani was predisposed. The jury's verdict, therefore, must not be disturbed.

POINT 3

DEFENDANT IS NOT ENTITLED TO A NEW TRIAL
BASED ON A JUROR'S POST-VERDICT COMMENTS
ABOUT THE JURY'S INTERNAL DELIBERATIONS.

In support of a motion for a new trial, Lakhani submits a transcript from a radio broadcast, in which a juror comments on jury deliberations.  Because the juror's statement is not competent evidence and runs afoul of established case law and a specific evidentiary rule, the motion must be denied without an evidentiary hearing.

It is well-settled that a juror cannot impeach her verdict.  McDonald v. Pless, 238 U.S. 264, 267 (1915). Accordingly, as a general rule, jurors cannot testify about the jury's internal deliberations.  This rule fosters several important public policies:

> (1)  discouraging harassment of jurors by losing parties eager to have the verdict set aside;
>
> (2) encouraging free and open discussion among jurors;
>
> (3) reducing incentives for jury tampering;
>
> (4) promoting verdict finality; [and]
>
> (5) maintaining the viability of the jury as a judicial decision-making body.

Government of Virgin Islands v. Gereau, 523 F.2d 140, 148 (3d Cir. 1975) (citations omitted); see also United States v. Lloyd, 269 F.3d 228, 237 (3d Cir. 2001); Wilson v. Vermont Castings, Inc., 170 F.3d 391, 394 (3d Cir. 1999).

An exception to the general rule -- which does not

34

apply in this case -- allows a juror to testify solely about extraneous influences on the jury. <u>Gereau</u>, 523 F.2d at 149-50. This exception addresses, for example, media reports discussed in the jury room, contact with third persons, or consideration of matters not admitted in evidence. <u>Id</u>. "By contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict." <u>Id</u>.; <u>see</u> <u>also</u> <u>United States v. Stansfield</u>, 101 F.3d 909, 914 (3d Cir. 1996).

This long-standing body of law is codified at Rule 606(b) of the Federal Rules of Evidence, which provides:

> **(b) Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b). As a result, not only may a juror not testify about internal jury deliberations, but any such statement by a juror, in whatever form, is not competent evidence.

Applying these standards, the Third Circuit has

35

repeatedly stated that Rule 606(b) precludes courts from considering a juror's statement that she was bullied by other jurors. E.g., Gereau, 523 F.2d at 149-50. Thus, in Stansfield, the Third Circuit refused to allow the defendant to attack the verdict using statements by jurors that the other jurors had coerced, insulted and intimidated them. 101 F.3d at 912-14. Other courts, likewise, have excluded testimony that a juror "thought that the jury would be kept out indefinitely until agreement was reached, . . . was overcome by weariness or unsound arguments of other jurors, or by a desire to return home." 3 Weinstein's Federal Evidence, § 606.04[3][a] (2d ed. 1997) (citations omitted).

It is inappropriate to conduct an evidentiary hearing where inquiry into the misconduct alleged would be barred by Rule 606(b). United States v. Gonzales, 227 F.3d 520, 524-27 (6th Cir. 2000) (reversing grant of new trial where "the district court scheduled a hearing at which the juror was permitted--indeed she was asked by the court--to do just what the common-law and Rule 606(b) prohibits"); United States v. Sjeklocha, 843 F.2d 485, 488 (11th Cir. 1988) (reversing grant of new trial because "the trial court erred in considering the juror's affidavit and the newspaper statement attributed to the juror"). Indeed, in Lloyd the Third Circuit reversed the district court's grant of a new trial, even though based on *extraneous influences* on the jury, in part because "the court's questioning went beyond the scope permitted by Rule 606(b)," and

36

tainted the court's inquiry into the extraneous influences.  269 F.3d at 238, 243.  The Third Circuit criticized the district court's inquiry into jury deliberations as "impermissible under Rule 606(b)."  Id. at 238.

Rather, the proper course is to refuse to conduct a hearing based on evidence barred by Rule 606(b).  In United States v. Richards, 241 F.3d 335 (3d Cir. 2001), for example, a defendant sought to challenge a verdict based on a statement by an alternate juror.  The alternate overheard two jurors comment before the close of evidence that they believed the defendant was guilty.  The district court properly denied the motion under Rule 606(b) without conducting a hearing, noting that "the jurors would necessarily be queried as to their thought process to determine whether or not the premature statements affected their verdict.  Therefore, inquiry as to the statement of these jurors would be prohibited under the rule."  Id. at 343.

This case presents a straightforward application of these precepts.  The jury returned a unanimous verdict finding Lakhani guilty on all counts.  Immediately afterward, each juror was polled in open court, and each assented to the verdict.  Afterward, one juror made comments about the deliberative process.  Those comments are simply not competent evidence, and testimony relating to them is strictly prohibited.  Because the proffered comments are all barred by Rule 606(b), Lakhani's motion must be dismissed without a hearing.  As a result, the jury's verdict rightly stands.

37

POINT 4

THE UNITED STATES SENTENCING GUIDELINES,
RENDERED ADVISORY BY <u>BOOKER</u>, MUST BE CONSIDERED
<u>BY THE COURT AND WILL YIELD A REASONABLE SENTENCE</u>.

In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the Supreme Court held that the Sixth Amendment right to a jury trial, as construed in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004), attaches to findings that enhance a defendant's sentence under the then mandatory federal Sentencing Guidelines.  The <u>Booker</u> Court found that the Guidelines' mandatory nature, when combined with judicial fact-finding, implicated the Sixth Amendment.  In order to remedy this problem, the Court invalidated parts of the Sentencing Reform Act that made the Guidelines mandatory, rendering them advisory.  The <u>Booker</u> Court emphasized, however, that district courts, while not bound to apply the Guidelines, must consult them and take them into account when sentencing, <u>id</u>. at 757, 764, 767.  As a result, sentencing courts are required to make all factual and legal determinations necessary to calculate a defendant's Guidelines range.

In determining the sentence to be imposed on defendant Hemant Lakhani, this Court must therefore consider the provisions of the Guidelines as applied to the facts of this case, and rule on any disputed Guidelines issues, including any departure motions.  The Court then has the authority to impose any sentence that is reasonable under the factors in 18 U.S.C. § 3553(a).  In making that determination, considerable weight should be given to

38

the Guidelines range recommended in the Presentence Report.

A sentence within the applicable Guidelines range will comport with the statutory concerns set forth in section 3553(a) because "the factors the sentencing commission was required to use in developing the Guidelines are a virtual mirror image of the factors sentencing courts are required to consider under Booker and § 3553(a)." United States v. Shelton, 400 F.3d 1325, 1332 n.9 (11th Cir. 2005). In formulating the Guidelines, the Commission was required to and has considered all of the section 3553(a) factors. 28 U.S.C. §§ 991(b)(1), 994(b)(1), (c), (f), (g), (m); U.S.S.G. § 1A1.1 Editorial Note. Since then, the Commission has continued to study district and circuit court sentencing decisions and "modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices" and "promot[ing] uniformity in the sentencing process." Booker, 125 S. Ct. at 766. Moreover, for many of the section 3553(a) factors, the Sentencing Commission has historical, comprehensive, and nationwide sources of information.

Congress "created the [Sentencing] Commission, approved the Guidelines, and then adjusted them over the years in an ongoing dialog with the Commission." United States v. Wilson, 350 F. Supp. 2d 910, 918 (D. Utah 2005). Sentencing within the applicable Guidelines range thus avoids unwarranted sentencing disparities between judges, districts, and regions of the country, and reflects the federal courts' collective sentencing

39

expertise accumulated over the past two decades.  All of these factors point to the "reasonableness" of a Guidelines sentence.

Furthermore, in this case, the sentencing range determined through the application of the Guidelines will yield a reasonable sentence.  The United States therefore urges the Court to impose a sentence within that range.

POINT 5

THE FACTORS OUTLINED IN 18 U.S.C. § 3553 WARRANT
A SENTENCE WITHIN THE GUIDELINES RANGE.

The stern sentence the Guidelines call for is consistent with the goals of sentencing set forth in 18 U.S.C. § 3553(a).  Section 3553(a) identifies a number of factors relevant to this matter:

(1)  The Guidelines sentence "reflect[s] the seriousness of the offense."  18 U.S.C. § 3553(a)(2)(A).  For nearly two years, Lakhani worked tirelessly to enable people he believed were terrorists to shoot commercial aircraft out of the sky and kill thousands of innocent civilians.  Few crimes present as grave a risk to the nation.  Lakhani's deliberate, purposeful behavior is of the utmost seriousness.

(2)  The Guidelines sentence "promote[s] respect for the law."  18 U.S.C. § 3553(a)(2)(A).  Lakhani promoted utter lawlessness, as he literally spoke of destroying American society.  In order to promote respect for our system of law, law enforcement officials and the courts need to respond to deliberate acts of terror in the most firm manner possible.

(3)  The Guidelines sentence "provide[s] just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  Lakhani knew who the victims of this intended scheme were, and he spoke callously of the thousands of civilian airline travelers targeted for death.  The severe punishment contemplated by the Guidelines is proper and just.

41

(4)   The Guidelines sentence "afford[s] adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B). Only one message should be sent in response to the horrific acts of terror Lakhani helped plan:  anyone attempting to commit such a crime will face a certain and lengthy prison sentence.  This message applies equally to middlemen, on whom terrorists rely, who try to profit from terrorism.  Lakhani attracted attention on two continents as he traveled extensively in pursuit of a missile deal.  His trial and sentence will likely continue to draw widespread, international interest.  For methodically plotting to aid terrorists and destroy human life on a massive scale, people like Hemant Lakhani should know that they will face the sternest possible consequences under the law.

(5)   The Guidelines sentence will provide defendant with needed medical care.  18 U.S.C. § 3553(a)(2)(C).  It is no small irony that our system afforded Lakhani excellent medical treatment for his physical ailments during trial -- notwithstanding his views of America and goal of destabilizing our country.  Lakhani will continue to receive medical treatment as needed, at a prison hospital or otherwise, as part of the Guidelines sentence.  The government does not object to his request to be designated to a facility that can provide such treatment.

(6)   The Guidelines properly account for the "nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  As

42

set forth previously, Lakhani first contacted the informant on the advice of someone Lakhani knew was a wanted terrorist. Following Qayyum's lead, Lakhani offered to obtain weapons for the informant.  For a number of years prior, this former clothing salesman had been attempting to establish himself as an arms dealer, through various arms sales he tried to broker.  Among other deals, Lakhani reported that he had been approached -- to obtain weapons -- by another man wanted for a series of bomb blasts.

At trial, defendant attempted to pass off his chilling words and efforts as nothing more than the harmless puffery of a bumbling businessman.  The jury rightly considered and rejected this representation and the broader entrapment defense raised. Even post-trial, Lakhani tries to present himself as a peace-loving man.  "I could never dream to hurt or harm any living insects, let alone human being," he tells the Court through his Presentence Report.  PSR, ¶ 78.  His words and actions to the contrary unmask this false front.  Indeed, his personal history, marked by an association with terrorists, along with the extreme circumstances of this offense, call for the sentence the Guidelines contemplate.

For these and other reasons, section 3553(a) and the Guidelines warrant the same stern sentence.

43

Conclusion

Defendant Hemant Lakhani enthusiastically tried to help people he believed were terrorists obtain shoulder-fired missiles in order to shoot down commercial aircraft on American soil. Lakhani now raises a number of post-trial motions that are without merit and should be denied without a hearing.  As a result, he awaits sentencing for convictions on five felony offenses stemming from this egregious conduct.

The Presentence Report, Sentencing Guidelines, and factors delineated by Congress for consideration at sentencing, all call for a sentence of life imprisonment for Lakhani's attempt to aid terrorists.  Accordingly, defendant Hemant Lakhani should be sentenced to the statutory maximum on each count of conviction.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
United States Attorney


s/ STUART RABNER
By:  STUART RABNER
Assistant U.S. Attorney

Newark, New Jersey
September 6, 2005

44